# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

LAVONNE EVANS,

    Plaintiff,

v.                                                       Civil Action No. 8:18-cv-02139-PX

NPAS, INC.

    Defendant.

\*\*\*

## MEMORANDUM OPINION

Pending before the Court in this fair debt collection case is Defendant NPAS Inc.'s ("NPAS's") motion for summary judgment, ECF No. 30, and Plaintiff Lavonne Evans' motion for judicial notice, ECF No. 42. The motions are fully briefed and no hearing is necessary. *See* Loc. R. 105.6. For the reasons discussed below, NPAS's motion is granted and Evans' motion is denied.[1]

## I.    Background

This case concerns whether NPAS's attempt to collect on a newly outstanding medical debt triggers federal statutory debt collection protections.

On March 21, 2017, Plaintiff Lavonne Evans was admitted to United Medical Center ("UMC"), a hospital in Washington, D.C., for a knee operation. *See* ECF No. 30-2 at 3–4; ECF No. 30-3 at 2–4. When admitted, Evans executed a document entitled "Conditions of Admission" that addressed, among other things, terms of payment for any treatment received at UMC. *See* ECF No. 30-3 at 3. The document stated that patient is responsible for "payment of charges" not otherwise "paid by any third party payor," and "all charges . . . that are not paid by

---

[1] Also pending is NPAS's motion to seal, which seeks without opposition to seal the contents of two business contracts on the grounds that their terms constitute trade secrets. *See* ECF No. 31 at 1. This motion is hereby GRANTED.

[her] insurance provider." *Id.* It also provided that a patient's failure to pay "an installment when due" could result in referral of the debt to the District of Columbia's Central Collection Unit ("CCU"), which is "authorized by law to charge an additional 20% of the outstanding balance at the time of placement." *Id.* The Conditions of Admission also stated that medical expenses for services at UMC "shall be paid in full at the time of discharge." *Id.*

Evans was discharged the same day she was admitted. *See* ECF No. 30-5 at 18 (records indicating "SVC" from 03/21/2017 through 3/21/2017). It is undisputed that Evans had health insurance and believed her insurance would cover whatever costs she incurred. *See* ECF No. 41 at 23. It is also undisputed that no invoice, bill, or statement of charges were presented to Evans for payment at the time of her discharge.

On June 6, 2017, Evans' insurer determined that it would cover the lion's share of the $10,138.29 costs, but that Evans was responsible for $228.30. ECF No. 30-5 ¶¶ 13, 16; ECF No. 30-6; *see* ECF No. 30-7 at 2. Seven days later, on June 13, 2017, UMC referred the $228.30 bill to NPAS for collection. ECF No. 30-5 ¶ 13; *see id.* at 12–15.

NPAS describes itself as an "early out" collection service retained by hospitals like UMC to obtain payments from patients for medical services that UMC had provided. *Id.* ¶ 2; ECF No. 32-1 at 2; ECF No. 32-2 at 2. NPAS's contract with UMC (called the "Extended Business Services Agreement," or "EBO") makes clear that NPAS will service only "early out" invoices, and will not service delinquent debt. ECF No. 30-5 ¶¶ 8–10; ECF No. 32-1 at 2–3; ECF No. 32-2 at 2–3.

With regard to Evans' outstanding bill, NPAS sent a her "Payment Request" dated June 13, 2017. ECF No. 30-5 at 21–22.[2] This letter stated that the total medical expenses incurred,

---

[2] Evans contends that this correspondence was sent to her on June 14, 2017. ECF No. 41 at 4.

less payments from the insurer, to arrive at the amount due. *Id.* It also explained that Evans' "insurance company was billed, leaving an unpaid balance of the amount shown above." *Id.* NPAS's letter asked Evans to "[p]lease send payment in full at this time," advised her that payment was due by June 28, 2017, and explained different payment options. *Id.* The reverse side of the letter also thanked Evans for choosing UMC and advised that NPAS was "managing [her] account for the healthcare provider." *Id.* at 22.

On or about July 14, 2017, NPAS sent Evans another notice that was substantially similar to the first correspondence. *Id.* ¶¶ 25–28; *see* ECF No. 30-8. It stated that NPAS "records reflect that you were previously contacted regarding the unpaid balance," and "to send payment in full today." ECF No. 30-8 at 2. It also listed a new payment due date of July 29, 2017. *Id.*

NPAS sent a third notice dated August 26, 2017. ECF No. 30-5 ¶¶ 29–30; ECF No. 30-9. 27–28. This letter—which bore the red-highlighted title of "Attention Required"—advised: "You are obligated to pay for the services provided and we strongly urge you to take advantage of this FINAL opportunity to settle your balance. If payment in full is not received, your account may be referred to a debt collector without further notice." ECF No. 30-9 at 2. The letter stated that the new due date for the amount owed was September 5, 2017. *Id.*

On July 13, 2018, Evans brought suit alleging violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"). Evans, more particularly, avers that NPAS violated the FDCPA through "false, deceptive and/or misleading" communication because it failed to identify itself as a debt collector or [advise] that any information obtained would be used for collection of" the debt. ECF No. 1 ¶¶ 23–27 (Count I). Evans also alleges that NPAS violated related notice and disclosure requirements applicable to debt collectors. *Id.* ¶¶ 28–31

(Count II).³

NPAS now moves for summary judgment, arguing that because Evans' debt was not in default when NPAS assumed responsibility for collection efforts, the FDCPA does not apply. *See* ECF No. 30-11 at 8–12. Evans opposes the motion and requests that the Court take "judicial notice" of averred facts in two, unrelated judicial opinions and information included in certain websites. ECF No. 42. Evans also objects to the Court considering certain record evidence and urges reopening of discovery. ECF No. 41 at 2–13. Each argument is addressed below.

**II.     Scope of Record Evidence**

Evans requests that the Court judicially notice facts included within two websites and *Direct Supply, Inc. v. Specialty Hospitals of America, LLC*, No. 1:11-cv-00683-JSG (D.D.C. March 27, 2013) regarding the corporate structure of UMC and its relationship to CCU. Evans also asks the Court to take judicial notice of the facts at issue in *Thomas v. City of Annapolis*, No. BPG-16-3823, 2018 WL 1183657 (D. Md. Mar. 6, 2018). Federal Rule of Evidence 201 allows the court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2). Of course, and critical to the request here, the judicially noticeable facts must be relevant to legal questions under consideration. *Wireless Buybacks, LLC v. Hanover Am. Ins. Co.*, 223 F. Supp. 3d 443, 451 (D. Md. 2016).

Evans' requests are easily resolved. The interrelationship between UMC and CCU is wholly irrelevant to whether NPAS qualifies as a debt collector. And nothing within *Thomas* presents even the opportunity to judicially notice any relevant facts. The request is denied.

---

³ The Complaint references in passing the Maryland Consumer Protection Act ["MCPA"] but does not otherwise allege a violation under this statute. ECF No. 1 ¶ 1.

Next, Evans lodges several "objections" to NPAS's record evidence that are best understood as motions to strike. At the summary judgment stage, the Court must consider only such record evidence as would be admissible at trial. *See* Fed. R. Civ. P. 56(c)(2). The Court addresses each objection separately.

First, Evans objects to certain portions of Steve Warner's sworn declaration. ECF No. 41 at 2, 5, 7–10. Warner is the Regional Vice President at Parallon Business Solutions, LLC, which indirectly owns NPAS. *See* ECF No. 30-5 ¶ 1. Warner also oversees collection operations at NPAS and thus has personal knowledge about how NPAS conducts its business. *Id*. According to Evans, Warner cannot to offer testimony "on behalf of NPAS" because NPAS did not disclose Parallon's ownership in its corporate disclosure statement or in discovery. ECF No 41 at 2–3. The Court disagrees.

Warner's role overseeing NPAS collection operations provides sufficient foundation for offering facts relevant to NPAS operations. Whether NPAS complied with this Court's corporate disclosure requirements, *see* Loc. R. 103.3 (requiring disclosure of "any parent or other affiliate of a corporate party and a description of the relationship"), does not undercut Warner's personal knowledge. Thus, although the Court must caution NPAS to ensure that it comply with this Court's rules regarding corporate disclosures, *see Bluebell Bus. Ltd. v. Jones*, No. RDB 17-2150, 2018 WL 3740694, at *16 (D. Md. Aug. 7, 2018), the Court finds no basis to exclude Warner's declaration.

Evans next contends that NPAS's "Account Notes" pertinent to Evans and an "Explanation of Benefits," purportedly authored by Evans' insurer have not been authenticated. ECF No. 41 at 2–3. Although Evans may be correct that Warner may not have personal knowledge regarding the authenticity of these documents, exclusion does not affect the outcome

of this matter. Put differently, even if the Court struck these documents from the record, it would nonetheless find that NPAS is not a debt collector as a matter of law. Similarly, whether UMC received partial payment from Evans' insurer does not affect whether NPAS is a debt collector under the FDCPA. Nor does the Court consider Warner's interpretation of the NPAS contract with UMC relevant to the legal issues before the Court.

As for Evans challenging documents reflecting UMC's referral of Evans' account to NPAS via UMC's electronic interface on June 6, 2019, *id.* at 13, the Court will not strike these records. They are records within NPAS custody and control, generated by its electronic recordkeeping system, and are proffered as authentic. *See* ECF No. 30-5 at ¶¶ 11–13 (Warner attesting the documents are "true and accurate" copies). This is sufficient to consider the documents at the summary judgment stage. *See* Fed. R. Civ. P. 56(c); *see also Sall v. Wells Fargo Bank, N.A.*, No. DKC 10-2245, 2012 WL 5463027, at * 1 n.1 (D. Md. Nov. 7, 2012). The Court next turns to the merits of NPAS's motion.

### III. Summary Judgment

**A. Standard of Review**

Summary judgment is appropriate when the court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine disputed issue of material fact, entitling the movant to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Emmett v. Johnson,* 532 F.3d 291, 297 (4th Cir. 2008). A mere "scintilla of evidence" suggesting a material dispute cannot defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Rather, the record evidence must demonstrate that a reasonable trier of fact could find in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Peters v. Jenney*,

327 F.3d 307, 314 (4th Cir. 2003).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)). Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is likewise warranted. *Celotex,* 477 U.S. at 322.

### B. Analysis

NPAS argues that the FDCPA does not apply to its attempts to collect Evans' debt on behalf of UMC because the debt was not "in default" at the time Evans' account was referred to NPAS. The Court agrees.

"The FDCPA protects consumers from abusive and deceptive practices by debt collectors." *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996). To that end, when a debt collector contacts a debtor in an "initial written communication," it must disclose that it "is attempting to collect a debt and that any information obtained will be used for that purpose." 15 U.S.C. § 1692e(11). The FDCPA prohibits further "the failure to disclose in subsequent communications that the communication is from a debt collector." *Id.* These provisions are "colloquially known as the 'Mini-Miranda'" requirement. *Dykes v. Portfolio Recovery Assocs., LLC*, 111 F. Supp. 3d 739, 744 (E.D. Va. 2015).

The FPDCA defines "debt collector" broadly as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of

7

which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). This definition, however, is subject to several exceptions. Importantly, the FDCPA and its notice requirements do not attach to "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . *concerns a debt which was **not** in default at the time it was obtained* by such person." *Id.* § 1692a(6)(F)(iii) (emphasis added). "To simplify, this exclusion means that a person collecting nondefaulted debts on behalf of others is not a debt collector." *Henson v. Santander Consumer USA, Inc.*, 817 F.3d 131, 136 (4th Cir. 2016), *aff'd*, 137 S. Ct. 1718 (2017); *see Fontell v. Hassett*, 574 F. App'x 278, 279 (4th Cir. 2014) (per curiam).

The FDCPA does not define what constitutes "default." *Ademiluyi v. PennyMac Mortg. Inc. Trust Holdings I, LLC*, No. ELH-12-00752, 2015 WL 2455811, *12 (D. Md. May 22, 2015); *see also Alibrandi v. Fin. Outsourcing Servs., Inc.*, 333 F.3d 82, 86 (2d Cir. 2003) (per curiam). Consistent with FDCPA's broad remedial purpose, the FDCPA allows for flexibility in determining whether a debt was in default to ascertain whether the defendant is a debtor whose actions fall under the FDCPA. As a result, Courts have confronted the question of whether a debt is in default under a variety of circumstances. Certain important principles have emerged.

The United States Court of Appeals for the Fourth Circuit has noted that "a default generally does not occur immediately upon a debt becoming due, unless the terms of the parties' relevant agreement dictate otherwise." *Fontell*, 574 F. App'x at 279; *see also Alibrandi*, 333 F.3d at 86–87. Accordingly, courts within this district and in sister circuits have focused on whether the creditor and debtor have agreed in advance to the period of delinquency that precede default. *Ademiluyi*, 2015 WL 2455811, at *13; *see also DeDios v. Int'l Realty and Investments*,

8

641 F.3d 1071, 1074 (9th Cir. 2011) ("Although the Act does not define 'in default,' courts interpreting § 1692a(6)(F)(iii) look to any underlying contracts and applicable law governing the debt at issue."); *Alibrandi*, 333 F.3d at 87 n.5. If the parties have "contractually set the period of delinquency preceding default, it will be a relatively simple matter to determine whether the Act applies." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 502 n.2 (7th Cir. 2008) *abrogated on other grounds*, *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017); *see also Prince v. NCO Fin. Servs., Inc.*, 346 F. Supp. 2d 744, 748 (E.D. Pa. 2004); *Hartman v. Meridian Fin. Servs., Inc.*, 191 F. Supp. 2d 1031, 1043–44 (W.D. Wis. 2002).

One other Circuit has held where the defendant servicer "treated the debt as if it were in default at the time of acquisition," then the FDCPA protections apply to the collection activities. *Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012); *see also Fausz v. NPAS, Inc.*, 237 F. Supp. 3d 559, 567–69 (W.D. Ky. 2017). Other courts have used as a "guiding principle" whether "a reasonable person in the debtor's position [would] believe that the creditor viewed the debt as being in default." *Mavris v. RSI Enterprises Inc.*, 86 F. Supp. 3d 1079, 1085 (D. Ariz. 2015); *see also Young v. NPAS, Inc.*, 361 F. Supp. 3d 1171, 1194 (D. Utah 2019).

When viewing the record evidence most favorably to Evans, no reasonable trier of fact could conclude that at the time NPAS assumed collection efforts, the debt was in default under *any* of the operative theories. Nowhere in the Conditions of Admission is any "default" or delinquency period specifically identified. The reference to payment being due upon discharge is simply inapplicable to Evans because she was not presented with any amounts owed at the time she left the hospital in March. Further, none of the notices that Evans received from NPAS ever tell Evans when her unpaid debt would be considered delinquent or in "default." *See* ECF No. 30-5 at 21.

9

Similarly, no evidence exists that the creditor, UMC, ever "treated the debt as if it were in default at the time of acquisition." *Bridge*, 681 F.3d at 362. Rather, per the terms of the agreement between UMC and NPAS, the hospital referred outstanding debts to NPAS only if they were *not delinquent*. ECF No. 32-1 at 3; ECF No. 32-2 at 3. Nor did NPAS take any action that would communicate to Evans the debt was delinquent or in default, such as assessing late fees or interest. Indeed, with each passing month, NPAS simply extended the date in which the amount was due. ECF No. 30-7 at 2; ECF No. 30-8 at 2; ECF No. 30-9 at 2. Accordingly, on this record, viewed most favorably to Evans, no trier of fact could conclude that the debt was in default when NPAS first assumed responsibility for collection in Jun 2017.

Evans also attempts to cleave closely to other cases in which NPAS has defended its collection practices, *see Fausz v. NPAS, Inc.* 237 F. Supp. 3d at 567–69 and *Young v. NPAS, Inc.* 361 F. Supp. 3d at 1195–96. These efforts are unavailing. In both *Fausz* and *Young*, credible evidence demonstrated that the hospital had communicated to the patient that the debt was past-due prior to the referral of the debt to NPAS. *Young*, 361 F. Supp. 3d at 1195–96 (where hospital previously placed debt with undisputed debt collector, subsequent transfer to NPAS for collection fell under FDCPA); *Fausz*, 237 F. Supp. at 563, 569 (NPAS is debt collector when assumed debt previously sent by hospital to other debt collector whose past efforts identified the debt as in default). No such record evidence allows a factfinder to construe the debt as being past due, or even due, at the time NPAS assumed responsibility for collection.

In sum, because Evans has not generated any evidence that the debt in question was in default at the time NPAS received the debt, the FDCPA does not apply. NPAS motion for summary judgment is granted.

## V. Requests for Additional Discovery

Discovery has long concluded. *See* ECF No. 16 at 2 (scheduling end of discovery for February 19, 2019). Yet Evans urges the Court to grant her "third-party discovery of UMC to determine whether or not 'UMC billed Plaintiff's health insurance carrier and received partial payment on June 6, 2017.'" ECF No. 41 at 3 (quoting ECF No. 30-1 ¶ 5). Evans also complains of NPAS's late disclosure of certain documents reflecting her insurance benefits. *See* ECF No. 30-6. She now seeks "full production of all documents that should have already been produced and to . . . conduct depositions once she has those documents." ECF No. 41 at 3. The Court finds none of Evans' arguments persuasive.

It is axiomatic that parties must diligently pursue discovery deficiencies before the close of discovery or bear the consequences of their lack of diligence. *See Innovative Therapies, Inc. v. Meents*, 302 F.R.D. 364, 384 (D. Md. 2014) (denying request for additional discovery due to lack of party's diligence). Evans at no point sought judicial intervention to correct such discovery deficiencies, and provides no good cause for the Court to accord her relief now, such as by demonstrating how the missing evidence prejudiced her claims. *Cf. Thomas*, 2018 WL 1183657, at *2–3 (emphasizing the propriety of reopening discovery based on the prejudice to the plaintiff). Nor can the Court conjure a theory of relief that makes the requested discovery necessary. Thus, the Court finds no basis to reopen discovery at this juncture.

## I. Conclusion

For the foregoing reasons, Plaintiff's motion for judicial notice is DENIED and Defendant's motion for summary judgment is GRANTED. A separate Order follows.

| _3/2/2020_ | _/s/_ |
|---|---|
| Date | Paula Xinis |
| | United States District Judge |